UNITED STATES of America

v.

Harry SCHREIBER.

Crim. No. 77–158.

United States District Court,
W. D. Pennsylvania.

April 12, 1978.

Blair A. Griffith, U. S. Atty., for plaintiff.

Edwin Martin, Pittsburgh, for defendant.

MEMORANDUM OPINION

KNOX, District Judge.

Defendant Harry Schreiber is charged in a seven count indictment with violations of 18 U.S.C. § 1001[1] in connection with the submission of false or fraudulent statements or representations to the Interstate Commerce Commission involving applications for emergency temporary authority and temporary authority.

He waived jury trial. The trial occupied all or part of eight calendar days and the matter is now before the court for disposition on the merits. We summarize the facts as follows:

(A) Summary of Facts.

The evidence demonstrated that Harry Schreiber, president and sole owner of Schreiber Freight Lines, Inc., in order to obtain a 29 state (Govt Ex 1 shows 31 states) authority from the Interstate Commerce Commission (ICC) instigated and participated in a plan whereby Schreiber Freight Lines' sales personnel[2] obtained blank letterheads from certain shippers which Schreiber Freight Lines served, filled in the body of these letters, signed the names of the representatives of the various shippers, and submitted them to the ICC in support of the Schreiber Freight Lines' application for authority. The letters contained false statements and representations which had not been authorized by the shippers.

Edward Schack, an attorney and Associate Director of the Office of Proceedings of the ICC explained that the ICC regulates surface transportation. An important part of this regulatory process consists in the licensing of motor carriers to conduct operations in interstate commerce. The license granted to a motor carrier is termed an "authority" which specifies a "route" or a geographical area within which a motor carrier may operate.

The types of authority which the ICC can grant are: an emergency temporary authority (ETA) which runs for 30 days and may be extended twice, a temporary authority (TA) which may run from 30 days to 180 days, and a permanent authority (PA). This last authority technically a certificate of public convenience and necessity has a monetary value and is salable.

The ICC will grant an ETA or a TA if the carrier can prove that an "immediate and urgent need" exists, or in the case of a permanent authority, if the carrier shows public need, convenience and necessity. Therefore shipper support[3] for the carrier's application for an ETA or TA is necessary to show an immediate and urgent need, and the ICC is dependent upon the shippers' statements to render a decision since that is the only record which the Commission has before it.

Schreiber Freight Lines, Inc., a motor carrier which from 1971 to August 1974 had the authority to haul steel and general commodities from Pittsburgh to Chicago, sought in August 1974 to obtain a 29 state

1. "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both." The ICC would constitute an agency of the United States under this statute since this would cover any executive, legislative or judicial agency of the government. See *U. S. v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955).

2. Joseph Bruzzese, Gerry Wurzer, William Cadwell and Paul Belczyk.

3. The application for authority must be accompanied by supporting certifications from shippers who claim they need the carrier to ship their goods. These certifications must show the commodities for which the need exists, the volume and points to be served and difficulties with existing service, if any.

authority[4] from the ICC. Mr. Schack presented a chronological listing of the Schreiber applications (6 ETAs and 2 TAs) for this additional authority (G Ex 32), and a clerk-stenographer for the ICC, Shirleen Harbison, testified to the receipt of the applications for the temporary authority for Schreiber in 1974.

Included within Schreiber Freight Lines' ETA Application filed on August 19, 1974 with the ICC in Pittsburgh, Pennsylvania (G Ex 1) and the TA application filed on August 29, 1974 (G Ex 2) were letters and certifications of support purportedly from seven shippers which formed the basis of the indictment. These shippers were Chrysler Corporation, Pittsburgh Forgings, Armstrong Store Fixtures, Stylette Plastics, Woodings-Verona, C.M. America and Duer Springs. (G Ex 3–9, inc.).

Nicholas Mascio, warehouse manager for the Parts Division of Chrysler Corporation, testified that despite a letter of support for the Schreiber application on a Chrysler Corporation letterhead signed by a "Mr. Ken White, Division Traffic Manager", Chrysler did not use Master Freight Forwarding Company (more precisely Master Forwarding Corp.), did not have a "desperate, urgent and immediate need" for that type of transportation service, and did not need Schreiber Freight Lines to haul its goods from Oakdale to Denver, Texas, Illinois and Louisiana. Any connection Chrysler had had with Schreiber had been with Schreiber Air Freight also owned by defendant. Andrew Gourash, office manager at Chrysler in charge of personnel, stated that Chrysler had never employed a "Ken White".

Pittsburgh Forgings Company's traffic manager, William Geesey, testified that the company's support letter had his name on it but that he had not signed it (his name was spelled incorrectly). In August 1974 Geesey had supplied a blank Pittsburgh Forgings letterhead to Schreiber's salesman Cadwell, although Geesey had not been aware of the exact purpose of the letter. He explained that the statements contained therein were not true as to the need for Schreiber's service. Pittsburgh Forgings did not have an "urgent need" for Schreiber Freight Lines' services to Albany, New York, Lansing, Michigan, Bowling Green, Kentucky, Jackson, Tennessee; Pittsburgh Forgings did not risk contract losses or plant shutdowns; nor did it utilize the services of Master Freight Forwarding and Central States Forwarding. Geesey also said that he never sent nor did he authorize anyone to use his name in sending mailgrams (G Ex 10 and 11) in support of Schreiber's application and that the mailgrams' information pertaining to the need for Schreiber's services was false.

Geesey was first shown the support letter in October 1974 by an ICC investigator, Robert Amerine. Later when contacted by Schreiber employees, Bruzzese and Cadwell, to sign an affidavit[5] saying that Geesey authorized Cadwell to sign Geesey's name, Geesey refused because he was angry about the letter and wanted no "part of it".

Donald Turcol, traffic manager of Armstrong Store Fixtures, stated that the letter of support for Schreiber Freight Lines written on Armstrong stationary had not been written, authorized nor signed by him although it purportedly contained his name.

---

4. On July 22, 1974, Schreiber Freight Lines, Inc. purchased two freight forwarders, Master Forwarding Corporation and Central States Forwarding Corporation. Together, these two freight forwarders had a combination 29-state authority. However, a freight forwarder differs from a motor carrier in that the latter may haul either full truck load or less than truck load shipments from point of origin to point of destination, while the former consolidates smaller shipments and then depends upon either a motor carrier or a rail carrier for the actual hauling. See 49 U.S.C. 1002. Harry Schreiber was seeking the same 29-state au-

thority for his motor carrier as he had for the two freight forwarders.

5. There exists some question as to whether these actually were "affidavits" since most traffic managers indicated either that they did not take an oath or that they did not know that a notary public was present. This so-called "affidavit" is really a form with blanks to fill in. The forms were prepared by Schreiber Freight Lines' personnel under the direction of the corporation counsel Krupnik at the direction of defendant.

In fact, the first time he had seen this letter was after the ICC investigation had begun in October 1974. Turcol later learned that a Schreiber salesman, Gerry Wurzer, had obtained a blank letterhead in August 1974 from Turcol's receptionist while he had been on vacation. Turcol pointed out the factual misrepresentations in the letter and certification of support. Armstrong had never used Central States and had only used Schreiber Freight Lines for inter-plant freight shipments from Evans City to New York and back to Pittsburgh. Armstrong had never encountered any difficulty in getting carriers because of its seasonal business.

Moreover, Turcol denied ever sending or authorizing anyone to send mailgrams (G Ex 13, 14, 15) in support of the Schreiber application. The information contained in the mailgrams was also false. Armstrong did not need Schreiber Freight Lines to haul to the specified destinations, nor did Armstrong stand to suffer "immediate and irreparable loss of business."

Turcol admitted to signing an affidavit (G Ex 28) in which he relates that he gave Wurzer permission to prepare the letter and to sign Turcol's name. Turcol stated that Wurzer and Fred Serbin, a notary public and another employee of Schreiber Freight Lines, visited Turcol at his house in October 1974, that he signed it to help them out and that the affidavit was false. Later, he was given a bottle of whiskey.

Lou James, traffic manager of Stylette Plastics, explained that he did not write or sign his name to the Stylette support letter although his name appeared at the bottom. In August 1974 James had given a blank letterhead to Bruzzese. The first time that James actually saw the support letter was in October of 1974 when ICC investigator Amerine confronted him with it. The letter itself was incorrect as to the need for Schreiber's services. There existed no "immediate and urgent need" since Stylette had many trucking outfits from which to choose. Following Amerine's visit, Bruzzese requested James to sign an affidavit (G Ex 29) which he did as an accommo-dation after learning that other traffic managers had done the same. James testified that the affidavit, itself, was false.

John Wysowski, former traffic manager with Woodings-Verona Tool Works, advised that he had given Wurzer a blank letterhead and had signed it, and because of this he was subsequently fired. Wysowski did not write the support letter and explained that the information therein was false. Woodings-Verona did not ship machinery but tools, and there had been no deadline problems facing its shipments. Although Woodings-Verona could always use another carrier, there was no "immediate and urgent need" for Schreiber's services. Wysowski also stated that on October 11, 1974 when Cadwell and Serbin came to his house to have him sign an affidavit (G Ex 30), he did so hoping he would get his job back. This affidavit was again untrue in several particulars.

John Belina, traffic manager for C.M. America, gave a blank letterhead to Cadwell on the premise that the letter would only specify that C.M. America supported Schreiber's application for authority to Texas. The actual support letter which was shown to him by Amerine in October, 1974, contained false information. C.M. America did not manufacture machinery nor did it ship to the specified destinations (except to Little Rock, Arkansas by UPS). Furthermore, C.M. America did not have active and inactive seasons, and there was no immediate and urgent need for Schreiber's services. No layoffs or plant closings were threatened. Belina denied knowing anything about mailgrams (G Ex 23 and 24) and indicated that their information was untrue. Belina admitted to having signed an affidavit at Cadwell's urging on October 15, 1974, but stated he had not read the contents.

Nicholas Liberatore, former traffic manager of Duer Springs, testified that he had used Schreiber Air Freight until 1975 when an air shipment was late and arrived after the road shipment. In August, 1974, Liberatore had given Cadwell a blank letterhead without knowing its purpose. He did not

write the support letter nor did he sign it even though his name (which was spelled incorrectly) appears at the bottom. The letter, itself, contained false statements. Duer never used Master Freight Forwarding or Schreiber Freight Lines; rather it usually used UPS for its shipments. Duer did not ship to Wisconsin or Michigan; it did not suffer any contract losses; and there was no "immediate need" for Schreiber's services. He admits signing an affidavit. The court finds that the testimony of the above shippers is true.

There is no question that there was here a scheme to inundate the ICC with false support documents, letters and mailgrams in connection with these applications. The questions critical to this defendant's case are whether this inundation was solely the work of Bruzzese general sales manager in the Pittsburgh area, who was convicted of similar charges at Criminal 75–322 and other subordinate employees or whether the enterprise was instigated by the defendant, president of Schreiber Freight Lines, with guilty knowledge of the falsity of the documents and whether he had such knowledge as to make him guilty as a principal under 18 USC 2 for causing such filings.

Harry Schreiber was a Wharton School graduate in Finance from the University of Pennsylvania and had been in the trucking business since 1963. In the early part of 1971, he became the sole stockholder of Schreiber Freight Lines, Inc. of which its officers were Harry Schreiber as president, Ron Faherty as vice president and Adelle Schreiber (Harry's wife) as treasurer-secretary. Mr. Schreiber described himself as a "man who likes to get things done".

Among some of the transportation companies owned by Harry Schreiber between 1971 and 1974 were Schreiber Express, Schreiber Air Freight and Schreiber Leasing. On July 22, 1974, Schreiber Freight Lines purchased two freight forwarders, Master and Central States.

The business location of Schreiber Freight Lines, together with the other Schreiber-owned corporations, was 220 Grant Street, Pittsburgh, Pennsylvania. Schreiber Freight Lines operated as a transportation broker whereby owner-operators would receive 75% and Schreiber 25% of the payments. The corporation had no trucks of its own. The freight bills in August of 1974 combined the names of Schreiber Freight Lines, Master and Central States on each.

Within ten days after the purchase of the two freight forwarders, Schreiber Freight Lines applied to the ICC for a 29-state authority as a common carrier through all these states which corresponded to the same geographical area as the two freight forwarders. The authority sought was to transport iron and steel, plastic articles and machinery requiring flat or open top equipment, as well as glass, from Knox, Clarion and Oil City, Pennsylvania restricted to shipments moving on bills of lading of Central States Forwarding and Master Forwarding. This was done under the guise [6] that the two freight forwarders could not get carrier service since the other carriers looked upon the freight forwarders as competitors because they were owned by Schreiber Freight Lines.

Mr. Schreiber admitted, on cross examination, that he was seeking to haul full truck loads rather than to consolidate smaller shipments under the freight forwarders' authorities, and that various carriers who had initially expressed interest in the 409 contract [7] indicated that the offered rate was not compensatory and therefore could not be accepted. Mr. Schreiber stated that this had only been an excuse. However, on rebuttal, Ron Faherty testified that they had known that such an offer was not eco-

**6.** On 12/26/73, Schreiber Freight paid a civil forfeiture of $2000 for 20 violations of operating in interstate transportation beyond the scope of its authority. From Jan. 1974 to Jul. 1974 Schreiber was again found guilty of 61 violations of operating beyond the scope of its authority. The court considers this as some evidence of the intent and attitude of defendant towards the ICC and its regulations.

**7.** A 409 contract permits a line haul carrier to give a reduced rate to forwarders for line hauls within 450 miles.

nomically feasible to a carrier because it would cost more for a truckload carrier to pay the driver and therefore the carrier could not make a profit. Harry Schreiber further admitted that he was, in essence, supporting himself before the ICC in order to get the 29-state authority and that he stood to benefit the most should the application prove successful since he was the sole owner of the Schreiber corporations.

While there is nothing wrong with a carrier seeking to expand its ICC authority, the use of false supporting documents is not the way to go about it.

Harry Schreiber stated that he was ultimately seeking a permanent authority since the problem of motor carrier service for the freight forwarders was a continuous one. However, Schreiber Freight Lines was soliciting business with its new 29 state temporary authority rather than just disposing of the goods which allegedly could not be moved. Mr. Schack's letter dated August 28, 1974 specifically informed Mr. Schreiber not to solicit.

The intent, purpose and motive back of the whole scheme is clear—to buy up two inactive freight forwarder authorities, mere shells, and then use them to support a far flung authority covering a large number of commodities covering the eastern half of the United States.

Joseph Bruzzese who was general sales manager for Schreiber in August 1974, and who was subsequently convicted for his involvement in this matter, testified that he first became aware that Schreiber Freight Lines was applying for an authority on the morning of August 15, 1974. Harry Schreiber called Bruzzese at his home and instructed him to have his sales personnel obtain support from the shippers that Schreiber solicited. Mr. Schreiber wanted his sales people to get blank letterheads from shippers and, if possible, to have them sign them. They were also to obtain information concerning types of commodities, weights and destination points. Time was essential in that an ICC representative was scheduled to pick up the letters.[8] Schreiber advised Bruzzese that a form was being sent and that the letters were to be prepared in the office. Bruzzese relayed the message to salesmen Wurzer, Belczyk and Cadwell and thereafter obtained two letterheads from Stylette Plastics and Bruce Molded Plastics.[9]

Wurzer obtained letterheads from Woodings-Verona, Allegheny Label, Blawknox Foundry, Armstrong Store Fixtures and Henry Miller Springs. Wurzer basically explained to the traffic managers that he really didn't know for what purpose the letterheads were needed, but that it was urgent. One traffic manager from Rayson Laboratory refused to have anything to do with the matter.

Bruzzese arrived at the office and went directly to Harry Schreiber whose office is on the seventh floor. Mr. Schreiber informed Bruzzese that the information had not yet arrived from Washington, D. C., but that as soon as it did, the secretaries, Nancy Vogel and Karen Stubinger, would bring the forms to the fifth floor[10] where the letters and certifications of support were to be prepared. Harry Schreiber told Bruzzese to have the secretaries use different typewriters and typewriter balls in order that the letters would not look alike. Bruzzese relayed this information to Karen Stubinger and told her to get Nancy Vogel.

Wurzer returned to the office just before noon and handed the information to Karen Stubinger (now Glendorf).

---

8. This was preposterous to claim that an ICC official would come to a carrier's place of business to secure letters to support an application. Such filings would be received at the commission's office.

9. Wurzer testified that Bruzzese also obtained the Chrylser letterhead but Bruzzese denied any knowledge of the matter.

10. The fifth floor was designated for the sales department. There were basically three offices: an unused office which provided the only access to the other offices, Bruzzese's office located to the right of the unused office and a large office for the three salesmen beyond the unused office.

The actual operation began in the afternoon on August 15, 1974 and was described as being "very hectic". The girls brought the forms with them and the salesmen drafted the various letters from the forms [11] putting in the various commodities, weights and destination points of the shippers. Harry Schreiber had instructed Bruzzese to have his people interchange the paragraphs of the forms, and Schreiber also gave instructions as to how to answer questions in the appendices to the support letters. Bruzzese, Wurzer and Stubinger identified the support letters (G Ex 3–9) as being part of those which had been prepared August 15, 1974.[12] All but one of these seven letters indicated that a carbon copy was to go to Harry Schreiber. As the letters were finished they were taken into Bruzzese's office.

Bruzzese explained that Harry Schreiber was very anxious that the information be finished. Harry would call on the terryphone (office intercom) and was physically present on the fifth floor on five or six different occasions. Mr. Schreiber came into Bruzzese's office to check the finished letters. Wurzer stated that he observed Harry Schreiber on the fifth floor once or twice to see how things were progressing and that he overheard Harry ask, "Are we going to be ready by five?" Miss Stubinger testified that she saw Mr. Schreiber on the fifth floor at least three times and that she heard him constantly call over the terryphone.[13] Harry Schreiber admitted that he stuck his head into Bruzzese's office in the afternoon.

At the end of the day, Stubinger and (Vogel), Wurzer and Bruzzese took the completed letters to Harry Schreiber on the seventh floor where they xeroxed the letters.[14]

Although Harry Schreiber and Bruzzese claimed that they advised the salesmen to call back the various traffic managers, Wurzer testified that Bruzzese told him to call back and thank the traffic managers but not to tell them what had been placed in the letters.

Harry Schreiber also had Bruzzese sign as an officer of Master and Central States Forwarders in their support for the Schreiber application appointing him "secretary for the day". Bruzzese had never been an officer of any Schreiber-owned corporation and stated that he had signed it without reading it since in August of 1974 he would have done anything Harry Schreiber told him.

Following the support letters, Harry Schreiber caused his employees to send

11. See G Ex 36 and 37.

12. They were also able to point out certain letters in which they had personally played a part in their preparation whether by signature or drafting.

13. Ms. Stubinger (which was Mrs. Glendorf at the time of trial) admitted, on cross examination that in February of 1976, she appeared before a grand jury and testified that she had not seen Harry Schreiber on the fifth floor in the afternoon of August 15, 1974. However, on redirect, Stubinger described a meeting that took place just prior to her grand jury testimony. Present at this meeting were four attorneys, two of whom were Harry Schreiber's brothers. Harry Schreiber was also there at the initial stage but was later requested to leave by Attorney Lalumere. In describing her recollection of August 15, 1974, to the four attorneys, Stubinger explained that every time she would involve Harry Schreiber in the operation, the others would yell at her and tell her that it was not Harry Schreiber but rather Joseph Bruzzese. Stubinger, when she testified before the grand jury, felt that nothing would evolve from the investigation, and since she was still employed by Schreiber Freight Lines told the grand jury that Harry Schreiber was not on the fifth floor. Finally she stated that her grand jury testimony as it relates to Harry Schreiber was false and that she decided to tell the truth after the conviction of Joe Bruzzese, a man she believed to be innocent since he was only taking orders from Harry Schreiber.

14. The defendant produced evidence that he was in Colorado on August 16, 1974, a Friday. A witness Golting, a contractor, says he saw him there on that day where defendant had a construction project under way. The overwhelming weight of the evidence is that he was in Pittsburgh Thursday, August 15, when most of the false support letters were prepared. Later, defendant was not sure whether he left for Colorado on Thursday or Friday. The court finds he went to Colorado on Friday afternoon.

mailgrams in support of the Schreiber application. Forms were prepared and a copy of one which contained Harry Schreiber's handwriting was introduced at trial (G Ex 38).[15] Wurzer, Bruzzese and Stubinger testified that they would send many mailgrams at one time and that in doing this they would identify themselves as the various shippers and have the expense billed to Schreiber Freight Lines, Inc.

Because of the number of support letters and of protests from other carriers [16] the ICC began an investigation of the Schreiber application in October, 1974. On Friday, October 11, 1974, ICC investigator Amerine, after discovering that the traffic managers had not written or authorized the letters, confronted Harry Schreiber with this information. Mr. Schreiber's initial response was one of surprise but then Mr. Schreiber asked, "Can we settle it here"? Amerine replied that he could not, but a meeting was scheduled with ICC officials in Philadelphia, Pennsylvania the following Tuesday. The court, however, does not infer anything sinister from Schreiber's inquiry.

Subsequent to Amerine's departure, Schreiber called the sales personnel to his office. Also present was Sheldon Krupnik, corporate counsel. Wurzer testified that Schreiber said that they had a problem, that the ICC had seen the shippers and had discovered the shippers had not written the letters. In order to neutralize the situation, Schreiber wanted a form affidavit (G Ex 40) [17] taken to the various shippers for their signature. Even after Wurzer explained that it would be difficult because one of the shippers had been fired and others were angry, Harry Schreiber did not question whether the shippers had, in fact, originally given their permission. Krupnik prepared the affidavits and a weekend campaign was launched to get them signed.

In February 1976, Paul Belczyk, who had been a salesman for Schreiber in August of 1974, was called to testify before the grand jury. Both Harry Schreiber and Sheldon Krupnik advised Belczyk not to say anything because the government could "put words in his mouth".

Finally, Ron Faherty stated that following the conviction of Joe Bruzzese, he was on the seventh floor of the Schreiber building with Harry Schreiber. Faherty suggested to Harry Schreiber that he, as president, would probably be indicted next. Mr. Schreiber replied that he was not worried about being indicted because, if he were, he could give the prosecutors a bigger person, namely an ICC Commissioner.

The court finds that this conversation together with the attempt to cover up by the defendant is indication of consciousness of guilt.

While defendant testified he had instructed Bruzzese to call the shippers back and report what information had been included in the support letters, he never checked to determine if this had been done although he knew the information was inserted by Schreiber employees in Schreiber's offices.

Defendant admits his handwriting is on the instructions for the mailgrams (G Ex 38) and he instructed Bruzzese to send them.

Masters and Central States Freight Forwarding Company were not in operation at the time defendant purchased their certificate in July 22, 1974. Nevertheless on September 13, 1974, defendant sent a telegram to the ICC urging immediate action on the application and representing that 5 million pounds of freight were backing up each day, an incredible figure.

---

**15.** The wording in G Ex 38, the mailgram form, corresponds to the wording in two of the actual mailgrams. See G Ex 11 and 15. Harry Schreiber claimed that he had read this form and that he had seen the wording of "immediate and irreparable loss".

**16.** There were 89 protests filed. As would be expected an application of this magnitude in-

volving new authority to transport a broad description of commodities as a common carrier between points in 29 states would naturally bring a storm of opposition.

**17.** This was prepared by Sheldon Krupnik and typed by Karen Stubinger.

■ The government must establish a specific intent, a willful and knowing violation of the statute. It is important that no defendant should be convicted unless the evidence shows a deliberate course of conduct with intent to violate the law and that he be not convicted where there is mistake, inadvertence or lack of guilty knowledge.

■ In the instant case and in the light of all the above recited facts, the court concludes that the defendant did act willfully and intentionally and with guilty knowledge. For instigating and causing these false documents to be sent, he would be guilty as, a principal under 18 U.S.C. § 2.[18] The court finds that the whole scheme of supplying the ICC with false and manufactured information was one instigated by the defendant and the court finds that Bruzzese and the other underlings in this corporation would not have thought this up and acted entirely on their own without defendant's guilty knowledge and participation. To summarize in determining defendant's involvement in this operation the court has considered the following:

(1) His attempts to cover up by having the affidavits circulated to the shippers in an attempt to cover the falsity of the support letters.

(2) The fact that the defendant was in and out of the room during the preparation of the false support letters and when they were finished the letters were taken to him. The information contained could not have come from the shippers in this short space of time.

(3) The defendant directed the sending out of the mailgrams which were also false and gave instructions as to how they should be drawn so as to conceal the fact they came from a single source at Schreiber Freight Lines.

(4) Defendant told Belczyk not to talk with the Assistant U.S. Attorney because they would put words in his mouth.

(5) Defendant instructed Bruzzese to get the support letters in, to get hold of letterheads and to have the shippers sign in blank. He instructed Bruzzese to use different typewriters and different type balls on the typewriters so as to conceal the fact that they came from a single source, to wit: the applicant Schreiber Freight Lines. He also was responsible for the orders to interchange paragraphs on the letters so that they would look different.

(6) In his haste he made Bruzzese secretary for a day for the two forwarding corporations supporting the application.

(7) Defendant's handwriting appeared on the instructions for the mailgrams.

(8) Defendant sent the telegram to the ICC on September 13, relative to the preposterous claim that five million pounds of freight were backing up per day.

In light of the foregoing and the facts recited at length above, the court has no hesitation in finding beyond a reasonable doubt that defendant aided, abetted, counseled and commanded, induced and procured the commission of the violations of 18 U.S.C. § 1001 and caused these acts to be performed.

(B) Evidence as to the Mailgrams.

■ Defendant has objected to the evidence of the sending of the mailgrams which were sent out by relays of operators from the Schreiber Freight Lines Offices calling Western Union reporting that they were shipper's representatives and then having the charges sent to Schreiber Freight Lines. This was without the consent or knowledge of the shippers. The court finds that this was all part of an attempt to overwhelm the ICC with pressure and an attempt to show a need for immediate and urgent action which did not exist.

These mailgrams and the circumstances of sending the same had been introduced at

---

**18.** "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

a prior trial of Bruzzese and the Corporation, Schreiber Freight Lines, Inc. and defendant and counsel were aware of them being used in evidence having received a transcript of the prior trial and its exhibits.

The court ruled that these were admissible for the purpose of showing intent, plan and design under Rule 404(b) of the Federal Rules of Evidence which reads as follows:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

See *U. S. v. Goichman,* 547 F.2d 778 (3d Cir. 1976); *U. S. v. Stirone,* 262 F.2d 271 (3d Cir. 1958) rev'd on other grounds 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). This evidence could not have surprised the defendant because he knew this evidence existed and the same was used only by the court to the extent it cast light upon his plans, motives, designs and method of operation.

(C) Continuance as Denying Speedy Trial.

The court had made an order that all documentary evidence to be used by the government should be produced to the defendant in advance of trial under Rule 16(a)(1)(C) which provides for the production of such evidence in the possession, custody and control of the government and which is intended for use by the government as evidence in chief. Certain exhibits were not produced and approximately one week before trial another Assistant U.S. Attorney took over the case. He discovered the order in question and dispatched these materials to the defendant the Friday before the trial began on the following Monday. When this was discovered at time of trial the court considered what should be done about the matter under Rule 16(d)(2) which reads as follows:

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, *grant a continuance,* or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."

The First Circuit has had this to say in such a situation in *U. S. v. Gladney,* 563 F.2d 491, 494 (1st Cir. 1977):

> "Violation of Rule 16(a)(1)(A), like the violation of other discovery rules, calls for the application of differing remedies depending upon the seriousness of the violation and the amount of prejudice to the defendant. In recognition of this, Rule 16(d)(2) provides for different remedies for non-compliance including—as an alternative to outright rejection of the non-disclosed evidence—a continuance.
>
> "The Government did not act in bad faith here—as, for example, by saving the tape for rebuttal, after its relevance was known, in deliberate violation of duties under Rule 16."

The court determined that no deliberate bad faith had been shown by the government and an appropriate remedy under 16(d)(2) was to give the defendant a continuance in the non jury trial with respect to presentation of the defense so that these exhibits could be examined, authenticity determined and defenses prepared to meet them. The court determined this was the appropriate remedy instead of absolute exclusion which the defendant urged.

The court determines there was no prejudice to the defendant since as a result of this the non jury trial was continued from December 19, 1977 at completion of the government case until January 30, 1978. The Christmas Holidays were approaching at which time the court had trials set in Erie to be followed by criminal jury trials definitely set at Pittsburgh. The continuance for the presentation of the defense thus gave the defendant as much time to

866

prepare to meet these exhibits as if they had been turned over to him by the government at the time they should have been. The court finds no abuse in discretion in granting this time. See also *U. S. v. Hathaway,* 534 F.2d 386 at 402 (1st Cir. 1976).

As the result of the foregoing, the court determines that the defendant is guilty beyond a reasonable doubt of the offenses charged in the indictment. This memorandum opinion contains the findings of fact as required by Rule 23(c) FRCrP.

An appropriate order will be entered.